## Amity Township School District, Appellant, *v.* Daniel Boone Joint School System.

Argued April 23, 1963. Before Bell, C. J., Musmanno, Jones, Cohen, Eagen, O'Brien and Roberts, JJ.

*David L. Levan*, with him *Jan L. Deelman, Victor R. Bieber, John E. Ruth*, and *Ruth, Weidner, Woerle & Yoder*, for appellants.

*Paul H. Rhoads*, with him *John C. Bradley, Robert D. Myers*, and *Rhoda, Stoudt & Bradley*, and *Rhoads, Sinon & Reader*, for appellees.

Opinion by Mr. Justice Musmanno, June 5, 1963:

The unanimity of desire for a desired collective result carries no assurance that there will be complete accord among the interested parties as to the method to be employed in achieving that result. Three school districts in Berks County—the Township of Amity, Township of Union and the Borough of Birdsboro—formed the Daniel Boone Joint School System and agreed that there should be erected in the approximate geographical center of their combined districts a junior-senior high school to meet the pressing educational demands of the area, the present buildings being in-

adequate to accommodate the pupil enrollment. Many classes were meeting in a church, on the stage of an auditorium and in the school cafeteria.

The majority of the representatives of the three districts, sitting as the Joint School System, decided that the contemplated school building should rise in a locale known as Maple Springs. The District of Amity Township protested and filed a complaint in equity against the other two districts and the Joint School System to prevent the purchase of Maple Springs. Two organizations known as the Amity Township Taxpayers' League and Union Township Taxpayers' League intervened as parties plaintiffs. The Court of Common Pleas of Berks County granted a rule to show cause why a preliminary injunction should not be granted. After due hearing, the chancellor dismissed the complaint. The plaintiffs appealed.

It would appear from the record that there is an immediate need in the Daniel Boone Joint School System for a new high school building, and that unless it soon rears its walls to house the swollen enrollment, half-day schedules will need to be instituted.

The Joint Board (composed of 15 members, 5 from each of the three districts) appointed in 1959 a committee made up of two members from each of the three districts, plus the President of the Joint Board, to canvass the area and report on a desirable site for the contemplated structure. The committee accepted suggestions from the three individual districts, examined the recommended sites, and finally made a unanimous recommendation that the Joint Board select one of two locations: Maple Springs and Amity Gardens. The Joint Board, again by a unanimous vote, authorized preliminary surveys and test borings of the two sites which were duly accomplished. Then on June 22, 1960, the Joint Board passed on the matter finally, with the Maple Springs site winning by a vote of 11 to 3 (the

Amity members being divided two for and three against Maple Springs). Later, Maple Springs gained the approval of the County Board of School Directors of Berks County, the Pennsylvania Department of Health, the Pennsylvania Department of Forests and Waters and the Pennsylvania State Council of Education.

As already indicated, the Amity Township School District now sought to prevent the finalization of the Maple Springs project and, together with its co-plaintiffs, argues the matter here. It contends that "on an east-west axis it [Maple Springs] is 1.4 miles off-center," and that since "the greatest width of the jointure is 6 miles," Maple Springs is nearly 50% off-center. The formal wording of the agreement is that the site "should be near the geographical center of the jointure, or in close proximity thereto." The land area of the combined three school districts does not make up a perfect territorial circle so that the precise center could become a simple mathematical determination. It is in fact quite irregular in shape and its geometric center is more illusory and academic than geographical. One can easily find the center of an unbroken egg, but once it is splashed into an omelet, each rivulet pursuing its own uninhibited way, it becomes impossible to locate a spot which would be perfectly equidistant from every segment of the irregular circumferential configuration.

The drafters of the Daniel Boone Joint School agreement knew that when the three districts combined, the resulting terrestrial figure would be something quite different from a perfect circle, square or parallelogram. They, therefore, said that the site should be "near" the geographical center or "in close proximity thereto." Considering the whole land mass involved in the jointure it cannot be said that a distance of 1.5 miles from the visionary, imaginative, hypothetical center is not "near" or in "close proximity thereto."

It is also to be considered that the geographical center was not visualized as a matter of symmetrical beauty but as one of utilitarian service. If the perfect geographical center of a school area were a large body of water or the peak of a mountain, it could not take precedence over an approximate center possessing all the facilities which a school demands and must have. Among the factors considered by the site committee and the Joint Board were such practical and important items as transportation, accessibility to walking students, sewage facilities, drainage, nearness of roads, nature of neighborhood, population, fire protection, grading, rock excavation, and proper water supply. The Maple Springs site answers all these needs admirably. Thus, aside from any contractual provision, we cannot accept the appellants' contention that the choosing of this site constituted an abuse of discretion on any basis of inadequacy or unsuitability.

The appellants' main argument is that even if the Maple Springs site meets utilitarian requirements, there are other sites equally desirable which do not violate the geographical designation in the agreement; therefore the Board abused its discretion in not taking a site closer than 1.5 miles by straight line and 2.2 miles by road measurement from the "geographical center." Thus, the appellants would have us interpret the contractual provision "This site should be near the geographical center of the jointure, or in close proximity thereto" to read: "This site *must* be *at* the geographical center of the Jointure." It is true that "should" may at times become an obligatory command, as for instance, where a judge charges a jury that unless they find from all the evidence beyond a reasonable doubt that the defendant is guilty, they "should" acquit. (*Foresi v. Hudson Coal Co.*, 106 Pa. Superior Ct. 307.) Such meaning, however, cannot attach to the word "should" where, as in the agreement under dis-

cussion, it is clearly contradistinguished from the mandatory "shall." The very paragraph in which "should" appears carries four mandatory "shalls", demonstrating almost conclusively that the drafters intended to allow the Joint School Board some latitude in selecting what would be the "approximate" geographical center.

It is interesting to note, in this connection, that the appellant, Amity Township District, itself recommended two sites (Bowers Estate and Amity Gardens), both of them 1.4 miles from the "geographical center." It would thus appear that when its own recommended site was involved, Amity Township was willing to make the geographical center a shifting one, but when its recommended site was rejected, it insisted on a precise spot. He who talks equity must accept equity. The action of Amity in once urging a site which was not the center of the jointure makes it amenable to the principle cogently set forth in *Birdsall Friedman Co. v. Globe & Rutgers Insurance Company*, 326 Pa. 404: "As the parties to the contract upon which this action is brought have interpreted it themselves, the law will assume that construction represents the true understanding of the parties."

Section 235(e) of Restatement, Contracts, summarizes the matter: "If the conduct of the parties subsequent to a manifestation of intention indicates that all the parties placed a particular interpretation upon it, that meaning is adopted if a reasonable person could attach it to the manifestation."

The record could well support the assumption that it was not until Amity's recommendations were rejected that it decided to put the dictionary on an anvil and hammer "shall" out of "should".

Prior to the authorization of the Maple Springs site, the Board had on March 21, 1957, passed a resolution providing for the purchase of the "Bowers Estate" as

the site for the intended schoolhouse. This project never attained fulfillment because the owners of the Bowers Estate would not accept the conditions imposed by the System upon the sale. The Board never formally repealed the Bowers Estate resolution. The appellants now maintain that the Maple Springs resolution was without legal effect because the Bowers Estate resolution was not rescinded. This is even a frailer reed than the geographical argument upon which to hang a hoped-for reversal of the lower court's decree. Even an act of the legislature may be rendered nugatory by a later inconsistent measure, though the latter act carries no repealing clause. In *Ulrich's Case*, 267 Pa. 233, we said: "The Act of 1915 contains no repealing clause nor does it purport to be a direct amendment of an earlier statute, though it deals with the subject-matter contained in the Act of 1855. The rule in such case is that if a conflict exists between the earlier and subsequent legislation the presumption is the latter was intended to repeal the former: York Water Co. v. York, 250 Pa. 115; and this would be true even though the latter act contains no express repealing clause, if apparently designed to accomplish that result."

A similar reasoning would apply to an inconsistent resolution of a Joint School Board. The fact situation in the history of this whole transaction clearly appears of record and shows that the Bowers Estate purchase was never consummated, and could not be consummated because the Maple Springs property was chosen instead. Thus, there can be no danger, as feared by the appellants, that it would be impossible to determine "without meticulous searches and capable legal advice," whether the Bowers Estate resolution was still floating in the air of unresolved decision.

The chancellor's findings of fact and conclusions of law are supported by the record and the applicable law and accordingly will not be disturbed.

Decree affirmed; each party to bear own costs.